Jeffery C. Pendleton,                           Civil File No. 09-733 JNE/AJB

            Petitioner,

    v.                                    **REPORT AND RECOMMENDATION**

Joan Fabian,

            Respondent.

This matter is before the Court, Magistrate Judge Arthur J. Boylan, on Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Petitioner Jeffery Pendleton ("Pendleton") is a prisoner confined in an out-of-state prison facility as the result of a conviction and sentencing in Stearns County District Court.[1] Pendleton was convicted by a jury on charges of first-degree murder with premeditation and first-degree murder while committing kidnapping and was sentenced to life in prison without the possibility of release. Pendleton was also charged with first-degree murder while committing robbery, but was adjudicated not guilty of that offense. This action has been referred to the undersigned United States Magistrate Judge for report and recommendation to the district court under 28 U.S.C. § 636 and Local Rule 72.1(a).

Pendleton alleges in his petition that: (1) the district court abused its discretion by refusing to instruct the jury that a witness was an accomplice; (2) the district court erroneously allowed the State to "knowingly offer[] false testimony" and then vouch for the testimony's truthfulness; (3) the evidence was insufficient to support the verdict; and (4) the cumulative

---

[1] Venue was transferred for trial in Stearns County, Minnesota, from Redwood County,

effect of the prosecutorial misconduct deprived him of a fair trial. Respondent filed a motion to dismiss [Docket No. 12] and opposes this section 2254 action as a mixed petition of exhausted and unexhausted claims, contending that Pendleton has failed to exhaust his state court remedies with respect to federal causes of action for three of the four claims. Respondent concedes Pendleton exhausted his state court remedies regarding the allegation that the evidence was insufficient to support the verdict. Respondent further contends that Pendleton has not established grounds for relief as to the merits of the exhausted claim and is not entitled to an evidentiary hearing. Pendleton filed a motion for miscellaneous relief, requesting that this Court deny Respondent's Motion to Dismiss. [Docket No. 16]. For the reasons stated below, it is recommended that the petition [Docket No. 1] be denied and dismissed with prejudice; Respondent's motion to dismiss be granted [Docket No. 12]; and Petitioner's motion for miscellaneous relief be denied [Docket No. 16].

**Background and Claims**

Pendleton was convicted of first-degree murder with premeditation and first-degree murder while committing kidnapping as a result of his participation in the September 24, 2004 kidnapping and slaying of Robert Berry, Jr. Mr. Berry was stabbed fifteen times and died as a result of his wounds. The facts of this case were summarized by the Minnesota Supreme Court as follows:

> "On the evening of September 23, 2004, appellant attended a party at S.W.'s house in Morton. A number of other people were present, including Vernon Jones, Keith Crow, Morris Pendleton, Jr., W.S., A.C., G.D., and L.B. People at the party were drinking alcohol and smoking marijuana. The victim, Robert Berry, Jr., arrived later. Berry was in a relationship with appellant's aunt, and appellant had briefly lived with Berry and his aunt. Appellant's aunt testified that Berry and appellant did not get along because Berry did not approve of the way appellant was "running around." Immediately after arriving at the party, Berry

---

Minnesota, the site of the offenses for which Pendleton was convicted.

began yelling at appellant. Berry ultimately threw a soda bottle at appellant, who then jumped over a table and began fighting Berry. (Footnotes omitted).

Berry began to get the upper hand in the fight, and appellant called for help. Crow restrained Berry while Morris Pendleton restrained appellant. At some point during the fight, Berry elbowed Crow, knocking off his glasses. Crow then punched Berry and knocked him unconscious. Appellant was released by Morris Pendleton and began to hit and kick the unconscious Berry. While hitting and kicking Berry, appellant screamed "I hate you" multiple times. During the fight, most of the people at the party left.

After the fight ended, everyone remaining at the party, except for Berry, left in Berry's green Chevy Tahoe truck and drove around with no clear destination. Morris Pendleton drove, with Crow in the front seat with him, appellant, Jones, W.S. and A.C. in the middle seat, and S.W. and L.B. in the back. During the trip, some of the people in the car discussed what to do with Berry. Appellant suggested that Berry be placed in the back of the truck and driven home. Morris Pendleton expressed concern that Berry might call the police, and suggested that appellant kill Berry. A.C. testified that appellant agreed to kill Berry and was acting "cocky" and "arrogant."

The group returned to S.W.'s house to pick up Berry, who was still unconscious. Crow asked S.W. for a blanket and a knife. Berry was wrapped in the blanket and appellant, Crow, Morris Pendleton, Jones, and W.S. carried Berry out to the truck and put Berry in the back of the truck. L.B. testified that A.C. opened the house door for the group. Morris Pendleton told Crow to tell A.C. to get in the truck so that A.C. would not call the police. S.W. and L.B. stayed behind and were told by Morris Pendleton to clean up Berry's blood or Morris Pendleton would hurt S.W.'s child.

Appellant, Crow, Jones, W.S., and A.C. left in the truck, with Morris Pendleton driving. There was no conversation during the drive about what was going to happen. Morris Pendleton drove the truck down a road to the edge of the Minnesota River. Everyone got out of the truck, and appellant, Crow, Jones, W.S., and Morris Pendleton took Berry out of the back of the truck and carried Berry down to the river. A.C. remained by the truck and talked to a friend on her cell phone. She could not hear or see what was happening at the river.

The state's medical expert testified that Berry was probably still unconscious when he was carried to the river. At the riverbank, Berry was stabbed fifteen times, resulting in his death. The only witness to testify about what happened by the river was Morris Pendleton. Morris Pendleton testified that appellant stabbed Berry more than once, and that while Crow egged appellant on, nobody forced appellant to stab Berry.

The group returned from the river after about ten minutes. Morris Pendleton was the first to return from the river, laughing while recounting that appellant had fallen in the river. Crow came up next, followed by W.S. and Jones. Appellant came up last, and, according to A.C., was soaking wet. When the group began to get back into the truck, Morris Pendleton said, "[W.S.] got him good" to which W.S. responded, "Hell, yeah, dog."

The group got in the truck and left the area. Morris Pendleton decided that the group should set the truck on fire. Everyone, including appellant, agreed. The group split up, with only Morris Pendleton, appellant, Crow, and A.C. remaining in the truck. At that point, Morris Pendleton drove to a house to get a can of gasoline. When he got back in the car, he handed the can to appellant. Then, Morris Pendleton drove back near the same area by the river where Berry had been taken. A.C. and Crow got out of the truck, and Morris Pendleton drove 15 or 20 more feet and set the truck on fire. A.C. testified she did not notice if anyone was in the truck when it was set on fire.

While the group drove to the river in the truck, a police officer on patrol in a squad car noticed the truck and decided to follow it. A.C., not knowing it was the police, and thinking it was a ride for the group that had been previously arranged, flagged down the squad car. After the squad car stopped, a police officer and A.C. noticed appellant fleeing wearing a white t-shirt. During the investigation, a white shirt was recovered from the area in which appellant was seen running. The shirt had blood on it from Berry, as well as DNA that could not be ruled out as being from appellant.

The police questioned Crow, who told the police that the group picked up three "white guys from Marshall" at the casino before the car got stuck in the mud and started on fire. A.C. agreed with Crow's fabricated story. An officer drove A.C. and Crow back to the reservation and released them. Once A.C. and Crow were back on the reservation, appellant walked up to them, not wearing a shirt. Appellant, A.C., and Crow got a ride from the reservation to Glencoe, and then from Glencoe to the Twin Cities.

After spending a few hours in the Twin Cities area, appellant, A.C., Crow, and another friend headed north to Bemidji. Appellant and A.C. sat in the back seat during the ride. A.C. asked appellant "if they really killed that dude" and appellant responded that he had stabbed Berry "a grip of times." A.C. interpreted "a grip of times" to mean "a lot of times." A.C. also testified that appellant was in possession of two necklaces, which he said had been Berry's. Other witnesses testified that Berry always wore necklaces. Appellant kept one of the necklaces but threw the other out the window. Appellant also had money, which A.C. testified was unusual for appellant, but A.C. could not be sure whether appellant had the money before the events of September 23-24.

> After spending a few days in Bemidji, appellant, A.C., and Crow went to Red Lake. There, the group parted; A.C. and Crow headed to Seattle and appellant eventually returned to the Twin Cities.
>
> On October 7, 2004, while appellant was still on the run, he called his father in prison. In that conversation, which was recorded by prison officials, appellant admitted that he was involved "a lot" in Berry's killing. Appellant did, however, deny that he actually stabbed Berry. He said that he "didn't wanna go" with the others to the crime scene and that he "didn't want to stab" Berry. Appellant also denied ever having stabbed Berry, telling his father that Morris Pendleton "put it [the knife] in my hand, told me to do it [stab Berry]. I told em ... I ain't doin it. And then I wiped ... it and I gave it back to em."
>
> Appellant also told his father that he was passed out in the back of the truck at the time Morris Pendleton set the truck on fire, and that Morris Pendleton intended to kill him. Appellant said he jumped out of the truck with his leg on fire and put it out. The driver of the car to Bemidji, however, testified that, during the ride and time in Bemidji, appellant seemed healthy, did not limp, and did not say anything about being hurt. A.C. also did not see any injuries or burns."

*State v. Pendleton*, 759 N.W.2d 900, 903-906 (Minn. 2009).

**Procedural History.** Pendleton was arrested for aiding and abetting murder on October 20, 2004. On January 14, 2005, Pendleton was indicted on three counts of first-degree murder. Pendleton was convicted of first-degree murder with premeditation and first-degree murder while committing kidnapping on August 20, 2007, for which he was sentenced to life in prison without the possibility of release. Pendleton appealed his conviction in state court, alleging substantially the same claims that are presented in the instant petition. The Minnesota Supreme Court affirmed the conviction in a decision dated January 29, 2009.

This habeas corpus action was commenced on March 27, 2009. In this case, Pendleton reasserts his appellate claims, alleging that the district court erred by not instructing the jury that a witness was an accomplice, the district court erroneously allowed the State to "knowingly offer[] false testimony," the evidence was insufficient to support the verdict, and the cumulative effect of the prosecutorial misconduct deprived him of a fair trial.

5

**Standard of Review**

Federal habeas corpus relief is only available to a person in custody in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. §2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

A writ of habeas corpus may issue only upon the showing that the underlying state court adjudication resulted in a decision that (1) was contrary to clearly established federal law, or involved an unreasonable application of clearly established federal law; or (2) was based on an unreasonable determination of the facts in light of evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). This Court "presumes that the state court's factual determinations are correct," a presumption that "may be rebutted only by clear and convincing evidence." 28 U.S.C. § 2254(e)(1), *Lee v. Gammon*, 222 F3d 441, 442 (8th Cir. 2000).

The exhaustion doctrine requires a petitioner to properly present state courts with the federal nature of legal issues before appealing to federal courts. *Rose v. Lundy*, 455 U.S. 509, 515 (1982). Both state and federal courts are equally bound to uphold the constitution and federal courts should refrain from removing cases under state jurisdiction without giving those courts "an opportunity to pass upon the matter." *Rose*, 455 U.S. at 518 (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1970). To fulfill this purpose, petitioners must give state courts one full and fair "opportunity to resolve any constitutional issues…." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If state courts do not receive that full and fair opportunity to rule on a federal constitutional issue, then federal courts should refrain from taking up that issue. *Rose*, 455 U.S. at 515.

In order to receive a full and fair opportunity to review the federal nature of a claim, a defendant must make "reference to a specific federal constitutional guarantee…." *Gray J.D. Netherland*, 518 U.S. 152, 162, 163 (1996) (citing *Picard v. Connor*, 404 U.S. 270, 271 (1971). This is more than just a "general appeal to a constitutional guarantee…." *Gray*, 404 U.S. at 163; Even if the state court examines a state legal issue that is similar to a federal issue, the exhaustion doctrine is not satisfied. *Gray*, 404 U.S. at 163. At a minimum, a petitioner "must have explicitly referred the state courts to the United States Constitution or federal case law." *White v. Dingle*, 267 Fed. Appx. 489, 492 (8th Cir. 2008) (quoting *Wyldes v. Hundley*, 517 U.S. 1172 (8th Cir. 1996).

Additionally, a federal court may not entertain mixed petitions. *Rose*, 455 U.S. at 519. In some instances, petitioners will submit multiple claims, some of which are unexhausted. Even if there are exhausted claims within such a petition, the entire petition must be dismissed. *Id.* at 522. Furthermore, federal courts will not review the merits of claims that have been defaulted due to state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

## Discussion

### Accomplice Instruction

Pendleton claims that the district court abused its discretion by refusing to give the jury a specific instruction that a witness was an accomplice. Pendleton contends that Alicia Connor was an accomplice to the crime and that the trial judge should have instructed the jury that accomplice testimony requires corroboration. Instead, the trial judge instructed the jury with a general accomplice instruction, allowing the jury to determine whether or not Ms. Connor was an accomplice. *State v. Pendleton*, 759 N.W.2d 900, 907 (Minn. 2009). The Minnesota Supreme Court found that the trial court's decision was not erroneous. *Id.*

Pendleton presented this claim to the Minnesota Supreme Court as a state legal issue. Pendleton's appellate brief only cited state law and state cases in support of this first claim. *See* Appellant's Brief in File No. A07-2313 ("App. Br.") pp. 14-18 [Docket No. 13-2]. Pendleton claimed that refusal of this jury instruction denied him a fair trial. However, there was no additional development of this argument that fairly notified the state court of the federal nature of the claim.

Without a reference to a specific federal constitutional guarantee, the Minnesota Supreme Court was not given a full and fair opportunity to consider the federal nature of the claim. Rather, the Court examined the issue in the context of state law and state precedent. It would undermine the purpose of the exhaustion doctrine to deny the state courts the chance to review the issue in the context of the federal constitution.

Furthermore, Pendleton's passing reference to a fair trial does not constitute a specific reference to a federal constitutional guarantee that would place the state court on notice of the federal nature of the claim. The reference to a "fair trial" was insufficient. *See Anderson v. Harless*, 459 U.S. 4, 7 (1982) (holding petitioner's reference to due process was insufficient to present federal claim). Because Pendleton's first ground was not presented as a federal issue to the Minnesota Supreme Court, it has not been exhausted as is necessary for federal review.

**False Testimony**

Pendleton claims that the district court erroneously allowed the State to "knowingly offer[] false testimony" and then vouch for the testimony's truthfulness. (*See* App. Br. pp. 18-21). The state called Morris Pendleton to testify despite having previously challenged his testimony during his own trial. The Minnesota Supreme Court ruled that the prosecutor properly

avoided the previously challenged portion of the testimony and focused on the unchallenged testimony of the witness. *Pendleton*, 759 N.W.2d at 908.

Pendleton cited the "*Larrison* rule," which originated in *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1982), for the test of when a new trial may be granted based on false testimony. (App. Br. p. 19). While this test originated in federal case law, the test was significant only because it was adopted by Minnesota in *State v. Caldwell*, 322 N.W.2d 574, 584-585 (Minn. 1982).[2] The *Larrison* test is not based upon a federal constitutional guarantee. Under the exhaustion requirement, defendants must properly notify state courts of the federal nature of an issue. This requirement was not met here.

**Sufficiency of Evidence**

Pendleton claims that the evidence presented at trial was insufficient to support his conviction. In *Satter v. Leapley*, the Eighth Circuit Court of Appeals held that "[a]ny challenge to the sufficiency of the evidence to convict in a state prosecution is necessarily a due process challenge to the conviction." 977 F.2d 1259, 1262 (8th Cir. 1992) (*citing West v. Wright,* 931 F.2d 262, 266 (4th Cir.) and *Jackson v. Virginia,* 443 U.S. 307, 322 (1979)). The court explained that because it is necessarily a constitutional issue, an insufficiency of the evidence claim is exhausted even absent a specific reference to a federal constitutional guarantee. *Id*. Respondent concedes that Ground III is exhausted.

---

[2]  Pendleton cited another federal case, *United States v. Johnson*, 327 U.S. 106 (1946). However, Pendleton cited this case in reference to the *Larrison* rule, not to notify the state court of the federal nature of petitioner's second claim. Therefore, Pendleton's second ground for the petition remains unexhausted.

9

**Fair Trial**

Pendleton contends that the cumulative effect of prosecutorial misconduct deprived him of a fair trial. In his direct appeal, Pendleton claimed that the prosecutor committed misconduct when the state presented the testimony of Morris Pendleton, improperly displayed a photograph depicting gang signs, misstated the law, and disparaged the defense. (App. Br. pp. 28-38). The Minnesota Supreme Court found that there was no prosecutorial misconduct on any of these grounds. *Pendleton*, 759 N.W.2d at 911-913.

Pendleton's prosecutorial misconduct claim was not fairly presented as a federal claim to the state court. Pendleton argued to the Minnesota Supreme Court that prosecutorial misconduct denied him his constitutional right to a fair trial. (App. Br. pp. 28 and 31). As explained in *White v. Dingle*, appellants must explicitly refer the state courts to a specific federal constitutional provision or pertinent case law discussing the federal issue in question. 267 Fed. Appx. 489, 492 (8th Cir. 2008).[3] Petitioner's general reference to a constitutional right to a fair trial was insufficient to present a federal issue.

In his Reply [Docket No. 17], Pendleton cites several court opinions from other circuits for the proposition that a federal court can address unexhausted claims under certain circumstances. These cases are not binding upon this Court. As discussed above, decisions of the U.S. Supreme Court and the Eighth Circuit Court of Appeals usually require this Court to dismiss mixed petitions. Because Grounds I, II, and IV are unexhausted, and Ground III is exhausted, this is a mixed petition.

---

[3] Pendleton also cites a federal case in the explanatory parenthetical of a Minnesota case citation. App. Br. p. 38 (citing *Johnson v. United States*, 520 U.S. 461, 468 (1997)). (App. Br. p. 38). *Johnson* discusses the standard for plain error review allowing an appellate court to correct an error not raised at trial. *Johnson* does not raise the issue of a federal constitutional right to a fair trial.

**Procedural Default**

Federal courts must review whether unexhausted claims are procedurally defaulted and; thus, barred from being heard in state proceedings. *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997). If a claim is procedurally defaulted, that claim is then similarly barred from review in federal courts unless cause and prejudice, or miscarriage of justice, can be demonstrated. *Id.* This applies only when the state procedural rule is well established and regularly followed. *Oxford v. Delo*, 59 F.3d 741, 744 (8th Cir. 1995).

Minnesota has "consistently held that a claim raised on direct appeal will not be considered upon a subsequent petition for post conviction relief." *Roby v. State*, 531 N.W.2d 482, 484 (Minn. 1995) (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976). This rule includes "all claims known but not raised by the defendant…" at the time of the direct appeal. *Carney v. State*, 692 N.W.2d 888, 891 (Minn. 2005). The procedural default rule set out in *Knaffla* is well established and regularly followed by Minnesota courts. 9 Minn. Prac., Criminal Law and Procedure § 39.1 (3rd ed.). However, federal courts will review procedurally defaulted claims if a petitioner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law," or if petitioner shows his/her actual innocence. *Reagan v. Norris*, 279 F.3d 651, 656 (8th Cir. 2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Pendleton's unexhausted claims are substantially the same claims raised in his direct appeal. The only difference is that Pendleton is now seeking to base the claims upon federal grounds. However, Pendleton could have presented his federal claims to the state court in his direct appeal.

Pendleton alleges his failure to fairly present the federal nature of his claims is the result of ineffective assistance of counsel because his counsel chose to focus on state law. Ineffective assistance of counsel cannot serve as cause to excuse a procedural default, unless the ineffective assistance argument has been fairly presented to the state courts as an independent challenge to the validity of the conviction or sentence at issue. *Bailey v. Mapes*, 358 F.3d 1002, 1004 (8th Cir. 2004) ("[a]lthough constitutionally ineffective assistance can serve as a 'cause' excusing a procedural default, the ineffective assistance claim must be raised in the state postconviction proceedings before it can be relied upon in a federal habeas proceeding"). *See also Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) ("'a claim of ineffective assistance'... must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default'") (quoting *Murray v. Carrier*, 477 U.S. at 489). Pendleton has not presented any claim of ineffective assistance of appellate counsel to any Minnesota state court, so he could not assert such a claim as cause to excuse his procedural default.

Pendleton also seeks to excuse his procedural default because he maintains his innocence. The Supreme Court has held that a claim of actual innocence must be supported with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 322-24 (1995). Petitioner has not offered any such evidence here. Therefore, Grounds I, II, and IV are procedurally defaulted and should be dismissed with prejudice.

**Merits of Sufficiency of Evidence Claim**

When reviewing the sufficiency of evidence to support a conviction, a federal court's scope of review is "extremely limited." *Sera v. Norris*, 400 F.3d 538, 543 (8th 2005) (quoting *White v. Dormire,* 340 F.3d 532, 536 (8th Cir. 2003). A federal judge's personal beliefs regarding the sufficiency of evidence are irrelevant to determining whether the evidence was

legally sufficient to support the conviction. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Rather, the analysis is whether "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Nance v. Norris*, 392 F.3d 284, 289-290 (8th Cir. 2004) (citing *Jackson*, 443 U.S. at 324). This requires courts to resolve any conflicting facts or inferences from those facts in favor of the prosecution. *Norris*, 392 F.3d at 290. This standard of review ensures that it is the fact-finders of a trial, and not reviewing courts, that determine the credibility of testimony and weigh the evidence in determining guilt or innocence. *Sera*, 400 F.3d at 543.

Pendleton was convicted of first degree murder with premeditation and first degree murder while in the course of a kidnapping. In his direct appeal, Pendleton claimed that there was insufficient evidence to convict him of either premeditated murder or kidnapping. (App. Br. pp. 21-27). Citing certain testimony in the trial transcript, Pendleton asserted that he wanted to leave Mr. Berry at his home in his car rather than kill him. (Trial Transcript ("T.") 704, 774-75). Pendleton contended that it was another man, who was present during the crime, who stabbed the victim. (T. 723, 781). In fact, Pendleton claimed that he expressly refused to stab the victim. (Appendix of Appellant Brief, A-8 – A-16, Docket No. 13-2).

Based on this testimony at trial, Pendleton argued in his direct appeal that the "record is devoid of intent" to kill the victim. Furthermore, Pendleton claimed that the evidence showed he abandoned his criminal purpose. Pendleton concluded the evidence did not support any intent to kill the victim, and instead showed that he expressly abandoned any such purpose; therefore, he suggested that he cannot be convicted of the two counts of first degree murder.

However, the evidence cited by Pendleton is not the only testimony heard by the trial court and the jury. One of the witnesses, Ms. Connor, testified that Pendleton agreed to kill the victim after murder was suggested. (T. 705, 709, 715). Ms. Connor testified that Pendleton

admitted to stabbing the victim during a car ride to Bemidji, Minnesota. (T. 750, 787). Ms. Connor also testified that Pendleton showed her two necklaces that he took from the victim. (T. 751).

In addition, testimony during trial showed that Pendleton participated in loading and transporting the victim in the vehicle. (T. 711-12, 940-41.) Morris Pendleton testified that he was present during the murder and he watched Pendleton stab the victim several times. (T. 1194-95). A white under-shirt was recovered from the area where the Tahoe was burned. The shirt contained DNA from the victim and DNA from a second contributor. (T. 1314-15). While the others present during the murder were excluded as contributors, Pendleton was not excluded. (T. 1315).

In reviewing the evidence here, there is sufficient evidence for a reasonable trier of fact to convict Pendleton of premeditated murder and first degree murder while in the course of a kidnapping. A jury is in the best position to determine the credibility of a witness' testimony. A jury can reasonably believe the testimony of Ms. Connor and Mr. Morris Pendleton, while not believing the recorded statements of the petitioner. Additionally, Pendleton's suggestion that the victim be dropped off at his house does not necessarily preclude his conviction. It is reasonable to conclude that Pendleton discarded his initial suggestion after agreeing to murder the victim. Furthermore, the state produced evidence that DNA from the victim and from Pendleton was discovered on a shirt likely worn by him. Pendleton is only emphasizing some evidence over other evidence, rather than showing that there is insufficient evidence to support his convictions. Yet, it is in the purview of a jury, and not the petitioner, to decide the importance of certain evidence.

When viewed in the light most favorable to the conviction, there is sufficient evidence for a reasonable jury to find petitioner guilty of first-degree premeditated murder and murder committed while in the course of a kidnapping.

Based upon all the files, records, and proceedings herein, the undersigned makes the following:

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Respondent's motion to dismiss be **granted** [Docket No. 12]; Pendleton's motion for miscellaneous relief be **denied** [Docket No. 16]; and the petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [Docket No. 1] be **denied and dismissed with prejudice** .

Dated:     December 11, 2009    

                                                                           s/Arthur J. Boylan    
                                             Arthur J. Boylan  
                                             United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before December 29, 2009, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A district judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.